**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

| | | |
|---|---|---|
| CHRISTOPHER WETHERINGTON, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:24-cv-00703-RBS-RJK |
| | ) | |
| FIRST SERGEANT KEIL, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT MASTER DEPUTY MATTHEW KEIL'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Christopher Wetherington respectfully submits this Memorandum in Opposition to Defendant Master Deputy Matthew Keil's Motion for Summary Judgment ECF No. 42.

## I. INTRODUCTION

Contrary to Deputy Keil's assertions, the undisputed facts and evidence in this case demonstrate that Deputy Keil violated Mr. Wetherington's Eighth Amendment rights when he orchestrated an excessive and punitive cell extraction on December 15, 2022. The evidence shows that Deputy Keil acted with malicious and sadistic intent, explicitly stating his purpose was to "show them what the fuck we're about" before directing deputies to carry Mr. Wetherington in a manner that resulted in serious injury. Material issues of fact regarding Defendant Keil's intent preclude summary judgment, and Deputy Keil is not entitled to qualified immunity for his plainly incompetent, unconstitutional conduct.

## II. PLAINTIFF'S OBJECTIONS AND RESPONSES TO DEFENDANT'S STATEMENT OF FACTS

1. Undisputed.

2. Undisputed.

3. Disputed. Mr. Wetherington testified that the reason he was being moved was because of the fact that he put feces on the wall in order to get a response from the guards.

> Q. Is there any particular reason why the deputies came to your cell at that point in time?
> A. I put feces on the wall. You know, I was kind of a little upset. I was having a hard time.
> flushing my toilet, and I was emotionally having a little episode.
> …
> Q. So are you saying that you did it to get someone's attention?
> A. Yes.

Pl. Dep. 9:10-15…10:8-10, **Ex. A**; See also Pl. Dep. 52:10-53:1; See also Lucas Dep.15:10-18, **Ex. B**.

4. Partially Disputed. While Plaintiff does not dispute that Defendant Keil called medical for permission to move Mr. Wetherington, he objects and disputes the Defendant's characterization that the move was motivated for Plaintiff's safety.

5. Disputed. According to Plaintiff's testimony, he was already covered in feces when the supervisor arrived and asked him to put his hands through the chuck hole.

> Q. And did you smear it on the walls of your cell, though, to get attention? Is that why you were doing that?
> A. Yes.
> Q. What was it you wanted attention for?
> A. I wanted a superior, a supervisor, anybody to come down there and discuss why they're not flushing my toilet.

Pl. Dep. 52:10-53:1; See also Pl. Dep. 9:10-15…10:8-10.

6. Disputed. Defendant Keil's intentions and self-serving deposition statements regarding cleaning him up are belied by the fact that they did not clean him up but instead took him to another cell, slammed his face into the ground, and then left the cell. In a favorable light, a reasonable fact

finder could determine that Defendant Keil had no intention of cleaning him up, at least not right away.

7. Undisputed.

8. Undisputed.

9. Undisputed.

10. Undisputed.

11. Partially disputed. While Plaintiff does not dispute that Defendant Hastings testified in this manner, a reasonable factfinder could disregard that statement, from the video given the attendant circumstances and outcome.

12. Partially disputed. While Plaintiff does not dispute that Defendant Goddard testified in this manner, a reasonable factfinder could disregard that statement, from the video given the attendant circumstances and outcome.

13. Partially disputed. While Defendant Lucas did state that he was not directed by Keil to injure Wetherington, he also testified that Defendant Keil's statement was a causative factor.

> Q. I've got one follow-up, Mr. Lucas. Do you feel like Defendant Keil's directive in any way led to the result of this incident?
> MR. TUNNER: Object to form. You can answer.
> THE WITNESS: Yes, sir.

Lucas Dep. 23:4-9.

14. Undisputed.

15. Partially disputed. It is less than clear from the video who exactly is making the statements. Furthermore, the expression "take your time," could reflect an intent to allow the other inmates in the adjacent cells an opportunity to observe the unconstitutional extraction. This inference properly flows from Defendant Keil's profane statement.

16. Partially disputed. It is less than clear from the video who exactly is making the statements.

17. Undisputed.

18. Undisputed.

19. Undisputed.

## III. PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS

1. Mr. Wetherington was not taken to the showers to be cleaned. Instead, they took him to the other cell, fractured his jaw, and left him in a pool of his own blood. Video of the incident.

2. Deputy Goddard testified that he was selected to extract Mr. Wetherington from a different part of the facility.

> Q. Okay. Tell me about the first time you learned that you were going to move Mr. Wetherington.
> A. I was working in a whole other section of the jail, and First Sergeant Keil called me to come help move him. I didn't really get any directive on the phone at the time.
> Q. Okay. Do you know why that he called you?
> A. No, not really.

Goddard Dep. at 9:19-20:2. **Ex. C.**

3. A factfinder could easily conclude that Deputies Goddard and Lucas were chosen for their size.



4. Deputy Lucas testified that the decision to move Mr. Wetherington was made after he had covered himself in feces.

> Q. Do you know why Defendant Keil made the decision to move Mr. Wetherington?
> MR. TUNNER: Object to form.
> You can answer.
> THE WITNESS: He covered his room in feces and himself in feces, and he was on ten-minute, and I think it would be cruel or unusual to keep him there and have him sitting in his own filth. So – I'm assuming.

Lucas dep. 15:10-18

5. Mr. Wetherington was in the medical housing department on suicide watch as he had previously attempted suicide. Lucas Dep. 15:4-8.

6. Deputies Goddard and Lucas both testified that the application of force was intentional. That they lifted him up and put him to the ground intentionally. Lucas Dep. at 19:1-14. Goddard Dep. at 11:4-12:22.

7. Deputies Goddard and Lucas testified that they had not performed cell extractions in this manner prior to the incident. Lucas Dep. 17:4-6; Goddard Dep. 8:21-9:2.

8. Deputies Goddard and Lucas' employment was terminated the same day, and Defendant Keil received the maximum demotion permitted by the facility as a result of this incident.

9. Dr. Johnson, a correctional operations expert, has opined that it was unnecessary and against correctional standards for the extraction to be performed in the manner it was performed. **Ex. D**.

## IV. ARGUMENT

### 1. Plaintiff's Recitation of Facts

While Defendant's statement of facts selectively presents evidence, the complete record reveals a disturbing pattern of deliberate indifference and excessive force. On December 15, 2022, Mr. Wetherington was housed in Cell M69 of the Medical Housing Unit at the Chesapeake Correctional Center. (Compl. ¶ 14; Pl. Dep. 17:3-11). He was experiencing a mental health crisis, having been placed on "ten-minute" suicide watch. (Lucas Dep. 14:20-22). Mr. Wetherington was emotionally distressed, as evidenced by his own testimony that he was "emotionally having a little episode." (Pl. Dep. 53:14-15).

Deputy Keil claims he decided to move Mr. Wetherington for his "safety" because other inmates were "egging him on." Def.'s Mem. In Supp. at 2-3, ECF No. 43. However, Deputy Keil's own statements immediately before the extraction reveal his true punitive intent. He explicitly told the deputies: **"We're carrying him all the way to the fucking back. We're going to make it so that they see what the fuck we're about."** (Video 00:54-00:59; Compl. ¶ 17). This statement was not about safety or maintaining order, rather, it was about making an example of Mr. Wetherington to demonstrate power and control to other inmates.

After Mr. Wetherington, in his distressed state, smeared feces in his cell, a common manifestation of mental health crisis in correctional settings, Deputy Keil orchestrated a cell

extraction. The deputies handcuffed Mr. Wetherington with his hands behind his back, lifted him in a prone position, and carried him "parallel to the ground" with no access to protect himself. (Pl's. Dep. 13:4-6). Despite Deputy Keil's last-second instruction to go "easy," the deputies intentionally slammed Mr. Wetherington to the ground face-first. (Video 01:50-55)[1]

Mr. Wetherington suffered a fractured jaw from being intentionally slammed face-first onto the concrete floor. (Pl. Dep. 21:3-4). The sound of impact was described as a "grunt" or "thud." (Lucas Dep. 20:19-23). Mr. Wetherington testified that the deputies "lifted me higher and slammed me." (Pl. Dep. 8:24-25). The deputies do not dispute this. *See* Pl.'s SOUF ¶6. Immediately following the incident, Defendants Lucas and Goddard were fired, and Defendant Keil received a maximum demotion.

**2. Legal Standards**

There are two claims asserted against Defendant Keil which present different questions. The first question that applies to both claims is whether the manner of the cell extraction itself was enough force to state an excessive force claim, given the requisite intent. "The 'core judicial inquiry,' we held, was not whether a certain quantum of injury was sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (quoting *Hudson v. McMillian*, 503 U.S. 1, at 7 (1992)). "In determining whether the force used was excessive, the court must look at the need for application of force; the relationship between that need and the amount of force applied; the extent of the injury inflicted; the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials; and any efforts made to temper the

[1] Both deputies testified consistently with their written statements that they "placed" Mr. Wetherington on the floor.

severity of the response." *Hicks v. Kiser*, 2022 U.S. Dist. LEXIS 177450, *5, 2022 WL 4593099, (citing *Whitley v. Albers*, 475 U.S. 312, 321 (1986)).

Given favorable inferences, Mr. Wetherington was not extracted in a good faith effort to restore discipline but to maliciously or sadistically cause harm. The force necessary to establish the underlying excessive force claim is satisfied by carrying him in the manner that he was carried, for the punitive purpose with which the extraction was performed.

Even if the Court finds that the manner of the extraction prior to its ultimate finale was insufficient to state a claim, the question then becomes, did Defendant Keil intend the injurious consequences (fractured jaw) of the extraction? There is sufficient evidence in the record to answer this question in the affirmative. Defendant Keil's intent should be resolved by a jury.

The Fourth Circuit has set forth three elements necessary to establish supervisory liability under § 1983. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). Typically, these claims are brought when supervisors have failed to act and not for personally directing a constitutional violation. There should be no question that Defendant Keil should be held liable under *supervisor liability* for personally organizing and directing a constitutional violation by ordering his subordinates to do the dirty work.

**3. Genuine Issues of Material Fact Preclude Summary Judgment**

Summary judgment is inappropriate when genuine disputes of material fact exist. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Here, multiple disputed facts are central to determining whether Deputy Keil violated Mr. Wetherington's constitutional rights. Furthermore, inferences taken from the undisputed facts, when viewed in a light most favorable to Plaintiff, circumstantially show that Defendant Keil intended the injurious consequences of the other deputies' actions.

The most critical disputed fact concerns Deputy Keil's intent. While Deputy Keil claims he acted for Mr. Wetherington's safety, his own words, "[w]e're going to make it so that they see what the fuck we're about," directly contradict this assertion. This statement, made immediately before the extraction, demonstrates punitive intent to make an example of Mr. Wetherington. When viewing this fact with the actions of the deputies, Mr. Wetherington's injury, and the fact that they left him in a pool of his own blood, a reasonable jury could conclude that Defendant Keil's intent meets the Eighth Amendment threshold for liability to attach under either claim.

Lucas testified that this statement affected the outcome of the event. Furthermore, Deputy Goddard was selected despite being across the facility, which demonstrates malice, given the deputies' size. Despite Deputy Keil's claims that the injury was unintentional, there is no dispute that the force was intentionally applied. Deputy Goddard and Lucas both testified that the application of force was intentional. *See* Pl.'s SOUF ¶6. Finally, Defendants Lucas and Goddard testified, consistent with Mr. Wetherington, that they lifted Mr. Wetherington up before placing him to the ground. This concerted action, when viewed in the light of all the other facts, shows teamwork, and a reasonable jury could conclude that it was the result of preplanning.

There are far too many issues of fact regarding the intent of Defendant Keil to grant Defendant's Motion for Summary Judgment under both Counts. The facts are sufficient for a reasonable jury to conclude that Defendant Keil intended the ultimate injurious consequences of this incident. There is no question that there was punitive intent regarding the way the extraction was carried out, and that it was carried out under Keil's direction.

**3. Deputy Keil Violated Mr. Wetherington's Eighth Amendment Rights**

Being carried prone and slammed face-first onto concrete, causing serious injury, clearly satisfies the objective component of an excessive force claim. There is no question that the

ultimate force used in this case was unreasonable and unnecessary. The force resulting in a fractured jaw is far more than de minimis. *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). A reasonable jury could also find that carrying a mentally distressed, handcuffed inmate face-down with no ability to protect himself was unreasonable and unnecessary without more, particularly given that Mr. Wetherington posed no threat to anyone. If the Court finds that the manner of extraction without more is enough force to allege an Eighth Amendment claim, the only question for the Court is whether this claim is properly asserted under Counts I or II, or both.

The subjective component of an Eighth Amendment claim requires showing the force was applied "maliciously and sadistically for the very purpose of causing harm" rather than "in a good faith effort to maintain or restore discipline." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992).

Applying the four-factor test as restated in *Brooks v. Johnson*, 924 F.3d 104, 113 (4th Cir. 2019), the subjective component is satisfied.

The first question is whether there was a need for the force used. Mr. Wetherington was experiencing a mental health crisis, not engaging in violence or threatening anyone. His spreading of feces was a symptom of his distress, not aggression requiring a forceful response. There was no need for the use of force. Defendant Keil had the opportunity for cool reflection and chose to extract Mr. Wetherington in a punitive manner.

The force used, a prone carry with hands restrained behind the back, was grossly disproportionate to any legitimate need. Alternative methods, such as waiting for Mr. Wetherington to calm down or using de-escalation techniques, were available. Including a wheelchair in the hallway right outside of Mr. Wetherington's cell. Furthermore, given Defendant Keil's statement punitive intent can easily be inferred.

Mr. Wetherington posed no threat. He was not violent, was already in a secure cell, and his only "offense" was refusing to cooperate while in mental distress.[2] Furthermore, his resistance was passive at best. He was laying down face-first, with his hands behind his back, when force was applied.

No efforts were made to temper the force used. While someone said "easy" at the last second, this belated instruction came only after Deputy Keil had already set the punitive tone with his "show them what the fuck we're about" statement. Moreover, the instruction was either too late, unheard, or disregarded, as Mr. Wetherington was still slammed face-first.

Deputy Keil's statement that they would "make it so that they see what the fuck we're about" is direct evidence of malicious and sadistic intent. This was not about safety or order—it was about punishment and making an example.

**4. Supervisory Liability Is Properly Established**

Plaintiff's supervisory liability claim against Defendant Keil is well-founded. Defendant Keil had actual knowledge that his instructions and statements created a risk of constitutional injury, and was a causal link of the same, as evidenced by:

1. His explicit statement setting a punitive tone
2. His decision to have Mr. Wetherington carried in a dangerous prone position
3. His failure to ensure proper safety measures during the extraction

The deputies understood Deputy Keil's message. While they may claim they didn't interpret it as an order to harm (after litigation commenced), the fact remains that Mr. Wetherington was severely injured during this "demonstration" of what they were "about." There is no question

[2] Mr. Wetherington only disobeyed the initial order to put his hands through the hole for cuffing. Mr. Wetherington obeyed all other commands as seen on video.

that a reasonable juror could find that Defendant Keil expressly authorized or condoned the use of force in this instance. *See* Hudson 503 U.S. at 12.

**5. Deputy Keil Is Not Entitled to Qualified Immunity**

"A defense of qualified immunity protects all but the plainly incompetent or those who knowingly violate the law, and it protects law enforcement officers from bad guesses in gray areas and ensures that they are liable only for transgressing bright lines." *Pena v. Porter*, 316 Fed. Appx. 303, 310 (4th Cir. 2009)(citations and quotation marks omitted). In this case, Defendant Keil acted in a plainly incompetent way, which is reflected by his maximum demotion. Moreover, the Fourth Circuit has found that a cell extraction done with excessive force was clearly established as unlawful. *Ussery v. Mansfield*, 786 F.3d 332, 338 (4th Cir. 2015)(decided under the prior framework *Norman v. Taylor*, 25 F.3d 1259 (4th Cir. 1994)).

As demonstrated above, Deputy Keil violated Mr. Wetherington's Eighth Amendment rights through excessive force applied with malicious intent. This is a bright line. It has long been clearly established that prison officials cannot use excessive force against inmates for punitive purposes. *Hudson v. McMillian*, 503 U.S. 1 (1992). More specifically, Courts have consistently held that using significant force against mentally distressed individuals who pose no threat can constitute excessive force. *See Estate of Armstrong v. Village of Pinehurst*, 801 F. 3d 892 (4th cir. 2015).

The Fourth Circuit and other courts have recognized that prone restraints that prevent an individual from protecting themselves during transport can also constitute excessive force. See *Iko v. Shreve*, 535 F.3d 225, 239 (4th Cir. 2008). Any reasonable officer would have known that orchestrating a forceful cell extraction with explicit punitive intent ("show them what the fuck

we're about") against a mentally distressed, non-violent inmate violated clearly established constitutional rights.

## V. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court DENY Defendant Keil's Motion for Summary Judgment in its entirety; find that genuine issues of material fact exist requiring trial; find that Deputy Keil is not entitled to qualified immunity; and grant such other relief as the Court deems just and proper.

The evidence, viewed in the light most favorable to Mr. Wetherington, shows that Deputy Keil orchestrated an excessive, punitive cell extraction against a mentally distressed inmate who posed no threat. His own words, that they would "show them what the fuck we're about," reveal his unconstitutional intent. A jury should determine what his real intent was and whether Deputy Keil's actions violated Mr. Wetherington's constitutional rights.

Date: September 5, 2025

Respectfully Submitted,
CHRISTOPHER WETHERINGTON

By: /s/
Counsel

Andrew Lucchetti (VSB No. 86631)
Jonathan Halperin (VSB No. 32698)
Halperin Law Center, LLC
4435 Waterfront Drive, Suite 100
Glen Allen, VA 23060
Phone: (804) 527-0100
Facsimile: (804) 597-0209
andrew@hlc.law
jonathan@hlc.law
*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 5, 2025, the foregoing ***Plaintiff's Memorandum in Opposition to Defendant Master Deputy Matthew Keil's Motion for Summary Judgment*** was served via the Court's CM/ECF system, which will send electronic notification to all counsel of record, including:

William W Turner, Esq. (VSB No. 38358)
Rachel W. Adams, Esq. (VSB No. 92605)
ThompsonMcMullen, P.C.
100 Shockoe Slip, 3rd Floor
Richmond, VA 23219
Telephone: (804) 698-6205
Facsimile : (804) 780-1813
wtunner@t-mlaw.com
radams@t-mlaw.com
*Counsel for Defendant First Sergeant Keil*

Jeff Rosen, Esq. (VSB No. 22689)
PENDER & COWARD, P.C.
222 Central Park Avenue, Suite 400
Virginia Beach, VA 23462
Telephone: (757) 490-6253
Facsimile: (757) 490-6253
josen@pendercoward.com
*Counsel for Defendants Deputy Lucas, Deputy Goddard, and Deputy Hastings*

/s/
Andrew Lucchetti – VSB No. 86631
*Counsel for Plaintiff*