IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Norfolk Division**

CHRISTOPHER WETHERINGTON,

        Plaintiff,

v.

                                          Action No. 2:24cv703

FIRST SERGEANT KEIL, et al.,

        Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter comes before the Court on two motions for summary judgment filed by defendants Matthew Keil ("Keil"), ECF No. 42, and Ronald Hastings ("Hastings"), ECF No. 45. For the reasons discussed below, the undersigned orders that the motions for summary judgment, ECF Nos. 42, 45, are **DENIED**.

## I.    PROCEDURAL BACKGROUND

On December 10, 2024, Christopher Wetherington ("plaintiff") filed suit in this Court against defendants Keil, Hastings, Quenton Lucas ("Lucas"), and Brandon Goddard ("Goddard"). ECF No. 1 ("Compl."). Plaintiff alleged that all four defendants violated his Eighth Amendment right to be free from cruel and unusual punishment (count I) and that Keil violated the Eighth Amendment in his supervisory capacity by authorizing and encouraging the other three defendants to engage in the unconstitutional punishment of plaintiff (count II). *Id.* at 7–8. Keil answered on February 17, 2025. ECF No. 12. Lucas, Goddard, and Hastings answered jointly on March 21, 2025. ECF No. 25. On August 22, 2025, Keil filed a motion for summary judgment on both counts. ECF No. 42. Plaintiff filed a memorandum in opposition to Keil on September 5, 2025,

ECF No. 49 ("Pl.'s Opp'n to Keil"), to which Keil replied on September 10, 2025, ECF No. 52 ("Keil's Reply"). On August 29, 2025, Hastings filed a separate motion for summary judgment on the sole count alleged against him. ECF No. 45. Plaintiff responded to Hastings' motion on September 12, 2025, ECF No. 53 ("Pl.'s Opp'n to Hastings"), to which Hastings replied on September 17, 2025, ECF No. 58 ("Hastings' Reply"). Both motions are ripe for decision.[1]

## II.    FACTUAL BACKGROUND

The facts below have been gathered from the pleadings, the parties' factual recitations for and in opposition to summary judgment, and the exhibits appended to the summary judgment filings, including body-worn camera ("BWC") footage[2] and excerpts of deposition testimony. The Court recounts all facts that are undisputed among the parties, while also noting inconsistencies among the sources and pertinent factual disputes.

On December 15, 2022, plaintiff was an inmate at the Chesapeake Correctional Center in Chesapeake, Virginia. Compl. ¶ 9.[3] On that day, Keil was employed as a First Sergeant, ECF No. 43 ("Keil's Mem.") Ex. 1, at 11:16–18 ("Keil Dep."), and Lucas, Goddard, and Hastings were employed as deputies for the Chesapeake Sheriff's Office, ECF No. 25, ¶¶ 6–8. Because of his recent history of suicidal ideation, plaintiff was housed in the medical unit on a 10-minute suicide watch. Keil's Mem. Ex. 6, ECF No. 43-6, 14:20–15:6 ("Lucas Dep."). Plaintiff testified that his recent mental health struggles included more suicide attempts at the Chesapeake Correctional

---

[1] All parties have consented to the undersigned's jurisdiction in this case. ECF Nos. 27, 28, 29.

[2] The Court was provided with a 2 minute and 58 second long segment of BWC footage on August 22, 2025, as Exhibit 2 to Keil's memorandum in support of summary judgment. The parties have not identified which deputy's camera shot the footage. However, all four defendants appear in the footage and are not wearing the BWC.

[3] All citations including a paragraph number are references to the parties' factual allegations in their pleadings or memoranda on summary judgment.

Center than he could remember, Pl.'s Opp'n to Keil Ex. 1, ECF No. 49-1, 27:4–13 ("Wetherington Dep."),[4] and at least one overdose, which Keil testified that he witnessed and helped save plaintiff's life, Keil Dep. 17:25–18:9.  On December 15, 2022, Keil decided to move plaintiff from his original cell in the medical unit to the back of the unit for plaintiff's own safety.  Keil Dep. 19:20–20:5.  Keil was concerned about other inmates in the medical unit "egging" plaintiff on and that plaintiff would "appease them and do something that could cause him[self] harm."  *Id.*; Compl. ¶ 15.

Keil initially intended to handcuff plaintiff through an opening in the cell door and walk him to the new cell.  Keil Dep. 21:18–24.  However, "[i]n protest" to Keil's request to walk handcuffed to his new cell, "[p]laintiff smeared his feces on himself and around his cell."  Compl. ¶ 15; *see also* ECF No. 46, ¶¶ 3–4 ("Hastings' Mem.").[5]  Keil then felt that plaintiff "left [Keil] with no choice" but to move plaintiff to a new cell given the contaminated state of his original cell and formed a team to extract plaintiff that included Lucas, Goddard, and Hastings.  Keil Dep. 21:16–22:3, 25:20–26:2.  Lucas and Goddard, plaintiff claims, were specifically selected as part of the extraction team "for their size" to frighten plaintiff.  Pl.'s Opp'n to Keil ¶ 3, at 4.  What followed the formation of this extraction team is what plaintiff alleges constitute two different uses

---

[4] Plaintiff's complaint alleges that he attempted suicide on December 3, 2022.  Compl. ¶ 10.  When asked about this specific attempt, plaintiff testified "[m]aybe.  Sounds Correct."  Wetherington Dep. 27:4–8.

[5] Plaintiff claims in his memorandum in opposition to Keil's motion for summary judgment that he was moved from his cell because he had already placed feces on his wall during what he described as "a little [emotional] episode" in an effort to get the attention of the deputies because his toilet was not flushing, not because he was protesting Keil's request.  Pl.'s Opp'n to Keil ¶ 3, at 2.  However, plaintiff admitted in his complaint that the fecal matter was smeared in protest to Keil's request to walk plaintiff to a new cell.  Compl. ¶ 15.

of excessive force:  (1) when the deputies extracted and transported plaintiff to his new cell; and (2) when plaintiff was propelled to the floor of his new cell.  Compl. ¶ 37.

It is at this point that a video provides the Court with uncontroverted evidence.  The video is without sound for the first 30 seconds, during which deputies gathered around the outside of plaintiff's cell to receive instructions from Keil.  Keil's Mem. Ex. 2, ECF No. 43-2, at 0:00–0:30 (CD file KEIL00216) ("Video").  At the start of the video, Keil can be seen standing in the middle of a group of deputies, pointing in the direction of the cell they intend to move plaintiff to.  *Id.* at 0:00–0:22.  As the sound cuts on, Keil then moves to the door of plaintiff's original cell and gives instructions for an unnamed deputy to hold a riot shield, for Lucas to take the right arm, Goddard the left, and Hastings the legs.  *Id.* at 0:30–0:55.  Keil announces to the group of deputies "we're going to carry him all the way to the fucking back.  We're going to make it so they see what the fuck we're about."  *Id.* at 0:55–0:60.  During this time, plaintiff cannot be seen through his cell windows which had been smeared with what appears to be fecal matter.  *Id.* at 0:00–1:09.  Keil opens the door, and four deputies (including Lucas, Goddard, and Hastings) enter the cell following behind the unnamed deputy holding the riot shield.  *Id.* at 1:03–1:10.  Keil and another supervisor, Seargeant Butler, file in last.  *Id.* at 1:06–1:09.

Plaintiff is lying face down on the ground of his cell with his arms by his sides when the deputies enter and begin to take his arms and place handcuffs on his wrists.  *Id.* at 1:10–1:16.  Once the door opened, deputies began giving plaintiff commands, which he obeyed.  *Id.*; Lucas Dep. 21:5–7.  Keil paces around the group of deputies as they restrain plaintiff while commanding plaintiff to "keep your head placed on the fucking ground, do you hear me?"  Video at 1:03–1:13.  Once plaintiff's handcuffs are secured, Lucas, Goddard, and Hastings take up their assigned positions and begin to carry plaintiff out of the cell.  *Id.* at 1:27–1:30.  Keil watches, noting "he's

4

out" as the deputies begin to move plaintiff. *Id.* at 1:28–1:30. Plaintiff's upper body is suspended, face downward, by Lucas and Goddard holding his upper arms and handcuffed wrists, when the deputies first begin to move him. *Id.* at 1:28–1:36. Plaintiff's legs drag on the ground for a second before the front of plaintiff's body crosses the original cell's threshold as the camera pans to a view of the hallway. *Id.* When the camera pans back, Hastings is holding plaintiff's legs by his ankles. *Id.* Plaintiff is still being carried in a plank-like, face-downward position by Lucas and Goddard who are holding plaintiff's arms behind his back unnaturally at a 90° angle to his body so that his wrists are almost touching, as depicted in Image 1 below. *Id.* As Lucas, Goddard, and Hastings cross the threshold of plaintiff's original cell, an off-camera voice can be heard telling Lucas and Goddard to readjust and hold plaintiff's shoulders instead of his wrists. *Id.* at 1:33–1:37. Goddard readjusts his grip on plaintiff to hold both his left shoulder and left wrist. *Id.* at 1:34–1:36. Lucas continues holding only plaintiff's right wrist and elbow. *Id.* at 1:33–1:50. During this encounter, plaintiff has what appears to be fecal matter smeared down his arms and legs. *Id.* at 1:00–2:58.

**Image 1: Plaintiff being carried down the hallway toward his new cell. Video at 1:37.**



Lucas, Goddard, and Hastings then begin to carry plaintiff down a hallway leading toward plaintiff's intended cell. *Id.* at 1:33–1:50. As plaintiff is being carried, he can be heard grunting while another off-camera voice tells the deputies to take their time. *Id.* An unnamed female deputy then holds the door of the new cell open to allow the deputies to carry plaintiff inside. *Id.* at 1:50. Once inside, Lucas and Goddard appear to raise plaintiff up from a height of approximately midway on their thighs to their waist and rapidly thrust him downward, with plaintiff's body pointed headfirst toward the floor.[6] *Id.* at 1:50–1:53. At that same moment, another voice from off-camera says "easy." *Id.* at 1:50–1:55. When plaintiff contacts the floor, a thud can be heard followed by the plaintiff exclaiming "Okay! Okay! Okay! I'm sorry!" *Id.* at 1:50–1:56. Lucas, Goddard, and Hastings proceed to remove the restraints from plaintiff while several deputies tell plaintiff to stop resisting. *Id.* at 1:54–2:37. Keil enters the cell a few moments later, following the deputy with the riot shield, Seargeant Butler, and the camera. *Id.* at 1:52–1:57. Plaintiff can be heard moaning as he complies with the deputies' orders, and they remove his restraints. *Id.* at 1:54–2:37. The deputies all exit the cell, leaving plaintiff lying face-down in the middle of the cell on the bare floor. *Id.* at 2:35–2:44. Keil then gives instructions to summon medical staff immediately and the video is cut off. *Id.* at 2:44–2:46.

The parties all agree that the way plaintiff was deposited in his new cell injured plaintiff's face. Keil's Mem. ¶ 16; Hastings' Mem. 5 (noting that Hastings only contests his role in the injury, not that an injury occurred). At this point, however, the parties' versions of events diverge. Lucas and Goddard claim that plaintiff attempted to bite Lucas or smear fecal matter on either of them,

---

[6] Plaintiff can be seen being raised up by the deputies carrying him. Video at 1:50–1:55. Then he is rapidly brought head-first toward the floor. *Id.* The video is obscured at this moment by the front wall of the cell and the camera is too far away to capture plaintiff contacting the ground or more than a glimpse of plaintiff being propelled toward the floor. *Id.*

so plaintiff had to be quickly brought to the floor. Lucas Dep. 18:23–24; Keil's Mem. Ex. 4, ECF No. 43-4, 10:25–11:3 ("Goddard Dep."). Plaintiff claims that his only instance of resistance was his initial refusal of Keil's request to walk to his new cell. Wetherington Dep. 11:1–5, 14:23–15:6 (noting that plaintiff did not move or speak while being restrained or carried).

After being propelled to the floor, plaintiff claims that he may have lost consciousness briefly and felt "warm under his chin." Wetherington Dep. 17:20–18:7. He testified that Chesapeake Correctional Center staff found blood under his face on the floor and attended to his jaw because he was unable to shut it or line his teeth up. *Id.* at 18:7–15. Plaintiff was transported to Chesapeake Regional Medical Center for treatment. *Id.* at 18:16–17. Emergency staff described plaintiff as having "stool and dried blood on chest, face, arms, and legs." Pl.'s Opp'n to Hastings Ex. 4, ECF No. 53-4, at 2. Upon arrival, plaintiff told emergency staff that he was involved in what staff described as a "moderate assault" in the jail which caused him a headache, right ear pain, right jaw pain, right shoulder pain, shortness of breath, chest pain, and abdominal pain. *Id.* Additionally, plaintiff claimed to have lost his back right molar in the incident and swallowed it. *Id.* Plaintiff was diagnosed with a "[d]islocation of temporomandibular joint," head contusion, chest wall pain, abdominal pain, and sprain of the right shoulder. *Id.* at 1.

### III.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that a district court shall grant summary judgment in favor of a movant if such party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The existence of some alleged factual dispute "will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247–48 (1986). "A genuine question of material

fact exists where, after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict for the nonmoving party." *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012).

Although the initial burden on summary judgment falls on the moving party, once a movant properly files evidence supporting summary judgment, the nonmoving party may not rest on the mere allegations of the pleadings but must set forth specific facts in the form of exhibits and sworn statements illustrating a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). "Because 'credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge,'" the Court must evaluate the evidence to determine whether there is "sufficient disagreement to require submission to a jury or whether [the evidence] is so one-sided that one party must prevail as a matter of law." *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014) (quoting *Anderson*, 477 U.S. at 251–52, 255). The Court must be cautious in awarding summary judgment for claims or defenses that rely on a state of mind. *Magill v. Guld & W. Indus., Inc.,* 736 F.2d 976, 797 (4th Cir. 1984). "Summary judgment is seldom appropriate in cases in which particular states of mind are decisive elements of [a] claim or defense, because state of mind is so often proved by inferences from circumstantial evidence and by self-serving direct evidence." *Id.* "However, this proposition does not mean that summary judgment is never appropriate on the element of knowledge. . . . [I]t must be clear that there is no issue of material fact as to whether [the party] acted with the requisite mental state." *Skibo v. Greer Labs, Inc.*, 841 F. App'x 527, 532 (4th Cir. 2021).

In making its determination, "the district court must 'view the evidence in the light most favorable to the' nonmoving party." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568 (4th Cir. 2015) (quoting *Tolan v. Cotton*, 572 U.S. 650, 657 (2014)). Moreover, where the relevant

8

facts are depicted by video evidence and one party's version of events "is so utterly discredited by the record that no reasonable jury could have believed him," the Court should view the facts "in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007). In the event that a party fails to respond to an argument, the Court must still engage in a summary judgment analysis but may consider uncontroverted facts to be conclusively established. *Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993).

## IV.    ANALYSIS

Keil seeks summary judgment against plaintiff as to count 1—excessive force in violation of the Eighth Amendment, and count II—supervisory liability for authorizing and encouraging his subordinates to engage in the same alleged excessive force. Keil's Mem. 1. Hastings seeks summary judgment against plaintiff as to count I. Hastings' Mem. 1. The Court addresses each motion for summary judgment in turn, construing the facts in the light most favorable to plaintiff. *Jacobs*, 780 F.3d at 568.

### A.    Keil's Motion for Summary Judgment

#### 1.    The applicable Eighth Amendment standard.

The Eighth Amendment was designed with an intention to "limit the power of those entrusted with the criminal-law function of government." *Whitley v. Albers*, 475 U.S. 312, 318 (1986) (quoting *Ingraham v. Wright*, 430 U.S. 651, 664 (1977)). The Cruel and Unusual Punishment Clause was specifically "designed to protect those convicted of crimes." *Id.* (quoting *Ingraham*, 430 U.S. at 671). To violate this clause, the conduct "must involve more than ordinary lack of due care for the prisoner's interests or safety." *Id.* at 319. Rather, "[i]t is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with

9

establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." *Id.* "The core judicial inquiry" in excessive force cases is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992).

Eighth Amendment excessive force claims involve a two-prong analysis, focusing on both an objective and subjective component. *Brooks v. Johnson*, 924 F.3d 104, 112 (4th Cir. 2019). "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called 'punishment,' and absent severity, such punishment cannot be called 'cruel and unusual.'" *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008). "The objective component asks whether the force applied was sufficiently serious to establish a cause of action. This is not a high bar, requiring only something more than 'de minimis' force." *Brooks*, 924 F.3d at 112. The "nature of the force, rather than the extent of the injury" is what determines whether more than de minimis force has been applied. *Hill v. Crum*, 727 F.3d 312, 321 (4th Cir. 2013). Keil concedes, for purposes of this motion, that more than de minimis force was applied to plaintiff, Keil's Mem. 9, therefore the Court need not delve further into this element in ruling on his motion.

The subjective component, however, "is a demanding standard" which requires "wantonness in the infliction of pain." *Brooks*, 924 F.3d at 112 (quoting *Iko*, 535 F.3d at 239). Wantonness "ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id.* at 113 (quoting *Whitley*, 475 U.S. at 320–21). Thus, the analysis turns on whether the officers in the present case used force for a constitutionally permitted purpose, rather than whether they *could* have used force for such purpose. *Id.* at 112.

The Supreme Court has outlined four main factors to determine whether wantonness is present: (1) "the need for the application of force," (2) "the relationship between the need and the amount of force that was used," (3) "the extent of the threat to the safety of staff and inmates," and (4) "any efforts made to temper the severity of a forceful response." *Whitley*, 475 U.S. at 321. The *Whitley* court also considered the extent of the injury as a factor, but did not include it as one of the main four. *Id.* "Even without direct evidence of malicious intent . . . we may 'infer the existence of the subjective state of mind' required for an Eighth Amendment violation from the *Whitley* factors." *Brooks*, 924 F.3d at 116 (quoting *Hope v. Pelzer*, 536 U.S. 730, 738 (2002)).

### 2. The applicable test for qualified immunity.

"[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is "an *immunity from suit* rather a mere defense to liability," and "is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Therefore, the question of qualified immunity should be resolved "at the earliest possible stage in litigation." *Pearson*, 555 U.S. at 232.

The Supreme Court has laid out a two-prong test to determine whether government officials are entitled to qualified immunity. *Id.* First, a court must decide whether the facts, viewed in the light most favorable to the non-moving party, make out a violation of a constitutional right. *Id.* And second, the constitutional right in question must have been "clearly established" at the time of the defendant's alleged violation. *Id.* Thus, to properly assert the defense of qualified immunity at the summary judgment stage, a government official must show "either there was no violation of

a constitutional right or the right at issue was not clearly established at the time of the alleged misconduct." *Ware v. James City Cnty.*, 652 F. Supp. 2d 693, 702 (E.D. Va. 2009).

The plaintiff bears the burden of proof on the first question—whether a constitutional violation occurred. *Mays v. Sprinkle*, 992 F.3d 295, 302 n.5 (4th Cir. 2021); *Stanton v. Elliot,* 25 F.4th 227, 233 (4th Cir. 2022). "But, [in the Fourth] Circuit, defendants bear the burden of showing that the violation was not clearly established, and they are therefore entitled to qualified immunity." *Mays*, 992 F.3d at 302 n.5; *see also Stanton*, 25 F.4th at 233. The Court has the discretion to address these two questions in the order that best facilitates "the fair and efficient disposition of the case." *Atkinson v. Godfrey*, 100 F.4th 498, 504 (4th Cir. 2024) (citing *Pearson*, 555 U.S. at 236).

In both counts against Keil, plaintiff alleges that force was unconstitutionally used against him. Compl. ¶¶ 32–45. The complaint sets out two different instances when force was used:  (1) when plaintiff was removed from his original cell and carried to a new one, thus resulting in his shoulder injury, and (2) when the deputies quickly propelled plaintiff to the floor, causing his dislocated jaw and head contusion. *Id.* at ¶¶ 18–21, 31, 37–38, 41. Keil makes several arguments in favor of summary judgment, which the Court addresses in turn below.

### 3.     Keil is not entitled to qualified immunity on count I.

#### a.     Keil is not entitled to qualified immunity because there are genuine disputes of material fact as to whether Keil had the intent necessary to violate the Eighth Amendment.

Keil first argues that he is entitled to qualified immunity because he lacked the requisite intent to violate the Eighth Amendment. Keil's Mem. 9–12. Keil asserts that when plaintiff refused to walk to his new cell and then contaminated his original cell with fecal matter, Keil was left with no choice but to apply a proportionate amount of force to resolve the threat plaintiff posed

to himself and the threat posed to him by other inmates. *Id.* at 10–11. This use of force, according to Keil, was first tempered by Keil's request to move plaintiff voluntarily, and therefore, Keil argues that the force was not a violation of the Eighth Amendment, entitling Keil to qualified immunity. *Id.* at 11–12.

Plaintiff responds by arguing that Keil violated the Eighth Amendment because Keil decided to extract and transport plaintiff face-down during a mental health crisis when he no longer posed a threat to anyone. Pl.'s Opp'n to Keil 9–10. Further, plaintiff asserts that there were other methods available than the use of the face-down carry—like a wheelchair—which demonstrate that the force was disproportionate and there were no efforts made to temper the force used. *Id.* at 10–11.

Because Keil has conceded that the de minimis force element is satisfied, Keil's Mem. 9, the Court proceeds directly to the second element of an Eighth Amendment violation—wantonness and the four *Whitley* factors for determining this subjective intent. As Keil was the supervisor leading the extraction and transport, the Court examines not only the facts surrounding Keil's direct actions, but also the actions of his subordinates as part of the effort he was leading. A reasonable jury resolving all factual inferences in plaintiff's favor could find that Keil's actions were intended to punish plaintiff rather than maintain prison order or protect officer safety.

Regarding the first factor—whether there was a need for force—a reasonable jury could find that force was no longer needed after the deputies entered the cell and successfully restrained plaintiff. The parties agree that plaintiff smeared fecal matter on himself and in his cell in response to Keil's initial request to walk to his new cell. *Compare* Compl. ¶ 15, *with* Hastings' Mem. ¶ 3, *and* Keil's Mem. ¶ 5. Given that keeping a prisoner in such conditions would likely be grounds for its own Eighth Amendment violation, *see e.g., Williams v. Griffin*, 952 F.2d 820, 824–27 (4th

13

Cir. 1991); *Gates v. Cook*, 376 F.3d 323, 338 (5th Cir. 2004), plaintiff could not have remained in his contaminated cell. However, taking the facts in the light most favorable to plaintiff, a reasonable jury could conclude the force used to carry plaintiff out of the cell was unnecessary because once the deputies entered the cell, plaintiff was compliant with all orders, Lucas Dep. 21:5–7, and could have possibly been permitted to walk to his new cell under escort. There is no other evidence to suggest that plaintiff was combative or disobedient after plaintiff was handcuffed, save Lucas and Goddard's assertions that plaintiff may have attempted to bite them near the end of the transport to the new cell. *Id.* 18:23–24; Goddard Dep 10:25–11:3. Thus, a reasonable jury could conclude that the first use of force—extracting and carrying plaintiff in a painful, face-down position with his arms unnaturally pulled far behind his back—was unnecessary once plaintiff became compliant.

The analysis is also not limited to the initial decision to use force because "even where an initial use of force does not by itself raise questions about a corrections officer's intent under *Whitley*, the continued application of force may give rise to an inference that force was used for malicious or punitive purposes." *Brooks*, 924 F.3d at 114. Even if a jury were to find that the deputies needed to initially enter the cell, handcuff plaintiff while he lay face-down on the floor in a compliant manner, and carry him to a new cell, a reasonable jury could find that the second use of force—propelling plaintiff to the ground—was unnecessary. Given the material factual dispute about the alleged bite at the end of the transport, a reasonable jury could find that propelling plaintiff to the ground was unnecessary because plaintiff never attempted to bite the deputies.

Next, the second factor examines the relationship between the need for force and the amount of force that was used, and plaintiff has created a genuine dispute of material fact regarding this factor. Keil simply concludes on this point that the amount of force was proportionate, Keil's

14

Mem. 11, while plaintiff argues that other methods should have been employed instead of carrying him face-down and that the deputies were not properly trained in this type of extraction and carry. Pl.'s Opp'n to Keil 10. Plaintiff asserts that the deputies could have used a wheelchair to transport him, *id.*, and the video shows a vacant wheelchair sitting in the hallway as plaintiff is being carried past it, Video at 1:39–1:44. Keil testified to being trained in extractions and how to carry inmates in an "escort" position. Keil Dep. 13:24–14:20; 22:14–23:15. However, Keil also testified when asked about whether the deputies properly carried plaintiff that "[a]fter reviewing the body cam footage, they were not. But you heard [Keil] and Sergeant Butler give them commands to hold him properly" on the video. *Id.* at 23:16–24. Despite these commands, Keil also claimed that he couldn't see how the deputies were carrying plaintiff during the transport. *Id.* Taking all the facts in the light most favorable to plaintiff, a reasonable jury could conclude that the amount of force used was disproportionate to the need given that there were other options available to the deputies than participating in a carry method inconsistent with their training and in depositing plaintiff on the floor of his new cell.

Turning to the third factor—the extent of the threat plaintiff posed to inmates and staff—a reasonable jury could similarly find this factor weighs in plaintiff's favor. Keil argues that plaintiff was a threat to himself due to the fecal matter smeared in his cell, Keil's Mem. 11, while plaintiff argues that "his only 'offense' was refusing to cooperate while in mental distress," Pl.'s Opp'n to Keil 11. Looking at the facts in the light most favorable to plaintiff, he was alone in his cell, lying face-down on the ground, and surrounded by four deputies and two supervisors inside the cell, with more outside, when the extraction and transport began. Video at 1:10–1:31. Plaintiff does not appear to make any statements or engage in any instances of combative conduct during the entire video. *See* Video. Rather, Lucas describes plaintiff as compliant until later in the transport

15

when he asserts plaintiff attempted to bite him. Lucas Dep. 18:23–24, 21:5–7. Even if a reasonable jury were to conclude that plaintiff was a threat to himself because of his recent mental health struggles, that same jury could find that, once the extraction and transport began, plaintiff no longer posed a threat to himself or anyone else given that he was compliant and restrained while under the close supervision of multiple deputies and supervisors.

Finally, the Court must also consider any efforts to temper the severity of the force used. Plaintiff argues that there was no effort to temper the force, Pl.'s Opp'n to Keil. 11, while Keil argues that his request to walk plaintiff to the new cell before proceeding to force was an effort to temper the force used, Keil's Mem. 11. Once plaintiff refused to walk to his new cell, Keil created the plan to extract and carry him in the face-down position and drafted deputies to assist. Keil Dep. 21:18–22:9. Given that Keil was present, instructing the deputies during the entire incident, and has admitted that the method used to carry plaintiff was not compliant with training, a reasonable jury could find he was in the best position to temper the force. Despite this position, he stated: "we're going to carry him all the way to the fucking back. We're going to make it so they see what the fuck we're about." Video at 0:55–0:60. Though Keil claims to have told the deputies to go "easy," a reasonable jury could conclude that another deputy made the statement as the speaker is not visible. Keil's Mem. 13; Video at 1:50–1:55. Taking the facts in the light most favorable to plaintiff, a reasonable jury could conclude that there was little to no effort to temper the severity of the force after plaintiff was handcuffed. A jury must decide whether Keil formed a plan with a singular goal of removing and transporting plaintiff by force and made statements to incite the deputies to use unnecessary force, thereby satisfying the subjective intent element of an Eighth Amendment claim.

  b.  **The right at issue in this case has clearly been established.**

Keil's second argument for qualified immunity is that he did not violate a clearly established right. Keil's Mem. 14–16. Determining whether there is a clearly established right is the second step in a qualified immunity analysis. *Pearson*, 555 U.S. at 232. The burden is on the defendant at this stage to demonstrate that even if there was a violation of a constitutional right, the right was not clearly established. *Stanton*, 25 F.4th at 233.

First, it is important to define the "right" that must clearly be established in this case. Keil contends it is the right "not to be carried in a prone position to a new cell while stating to subordinates a statement such as, '[w]e're going to make it so that they see what the fuck we're about.'" Keil's Mem. 15. However, plaintiff defines it as the "right to be free from the use of cruel and unusual punishment, including the use of excessive force." Compl. ¶ 34. Plaintiff further explains that using excessive force for punitive purposes, against mentally distressed individuals who pose no threat, and with "prone restraints" that prevent an individual from protecting themself are all clearly established examples of a violation of the Eighth Amendment. Pl.'s Opp'n to Keil 12–13.

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he or she is doing violates that right." *Atkinson*, 100 F.4th at 505 (quoting *Adams v. Ferguson*, 884 F.3d 219, 226 (4th Cir. 2018)). "To be clearly established . . . [t]he rule must be 'settled law,' which means it is dictated by 'controlling authority' or 'a robust "consensus of cases of persuasive authority.'"" *District of Colombia v. Wesby*, 583 U.S. 48, 63 (2018). Courts must define a clearly established right in particular terms, tailored to the circumstances of the case at hand, rather than in general terms. *Atkinson*, 100 F.4th at 505. Thus, for a right to be clearly established, "there must be case law not just about the general principle

that law enforcement officials violate" the Eighth Amendment by participating in a cell extraction for punitive purposes, "the law must establish that conduct similar to [the defendants'] is unconstitutional." *Id*. The caselaw need not be exactly on point, but it must have placed the question "beyond debate." *Id*. Ultimately, "the key inquiry is whether 'the law provided "fair warning" that the officer's conduct was unconstitutional.'" *Id*. at 506 (quoting *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538 (4th Cir. 2017)).

The caselaw is clear that the right must be defined in terms that are tailored to this particular circumstance. For example, in *Iko v. Shreve*, the Fourth Circuit defined one of the plaintiff's rights as the "right to be free from excessive use of pepper spray" in a case where material facts were in dispute regarding whether the officers had used more pepper spray than was necessary in a cell extraction. 535 F.3d at 231–32, 240. The *Iko* decision is an example of the court narrowly defining the right to be free from the type of force used (pepper spray) and not necessarily the context the force is used in. However, in *Thompson v. Commonwealth*, officers were found to have "violently toss[ed] a prisoner around in a moving vehicle," and the Fourth Circuit defined the plaintiff's right "at the appropriate level of specificity" as the right of a prisoner "not to be assaulted by [his] captors." 878 F.3d 89, 102 (4th Cir. 2017). In this latter instance, the court defined the right more broadly and without specific reference to the type of force or the circumstance in which it was used. *Id.*; *but see Brooks*, 924 F.3d at 119 (defining the right both generally as the use of force in bad faith "to punish through the 'wanton infliction of pain'" and specifically as "multiple uses of a taser against [the plaintiff], under the circumstances of this case") (quoting *Williams v. Benjamin*, 77 F.3d 756, 765 (4th Cir. 1996)). Therefore, following these examples, the Court must determine whether there is a clearly established right that inmates have to be free from pain inflicted maliciously and in order to cause harm, rather than in a good faith effort to protect officer safety

or maintain prison order. More specifically, the Court must ask whether it was clearly established that an officer uses excessive force if he maliciously uses force against a subdued or restrained inmate in the course of transporting the inmate from one place to another for a purpose other than protecting officer safety or maintaining prison order. The Court is satisfied that the caselaw has clearly established this right.

In *Thompson v. Commonwealth*, the plaintiff was allegedly secured in "handcuffs, leg irons, a belly chain, and a black box" when two corrections officers gave the plaintiff a "rough ride" in transit to a prison. 878 F.3d at 94. The officers reportedly refused to fasten the plaintiff's seatbelt, and he was thrown around a van as it drove down the road, forwards and backwards, "causing bleeding and bruising on his forehead, hands, and arms." *Id.* at 94–95. The Fourth Circuit reversed the district court's grant of summary judgment and found that a reasonable jury could conclude that the defendant had maliciously subjected plaintiff to a rough ride, which was more than a de minimis application of force, and that the right of prisoners "not to be assaulted by their captors" was clearly established at the time of the incident, therefore precluding the application of qualified immunity. *Id.* at 101–02, 106; *see also Dean v. Jones*, 984 F.3d 295, 304 (4th Cir. 2021) (explaining that "it is 'well-established . . . that officers may not use gratuitous force against a prisoner who has already been subdued . . . [or] incapacitated'") (quoting *Thompson*, 878 F.3d at 104).

A few years before *Thompson*, in *Mann v. Failey*, the Fourth Circuit found that the trial court erred in granting summary judgment for the officers on another excessive force claim. 578 F. App'x 267, 274 (4th Cir. 2014). Mann made several accusations of excessive force, but of particular interest in this case was his claim that excessive force was used during a cell extraction. *Id.* at 274. The Fourth Circuit found that Mann could

19

> amply make the case that officers on the cell extraction team wrapped a bed sheet around Mann's neck, choked him into unconsciousness with it, continued to beat him after he had been wrestled to the floor and had been placed in leg and arm restraints, and afterward slammed his face into iron doors and bars en route to a holding cell.

*Id.* Though Mann had first assaulted the officers by throwing bottles filled with fecal matter at them, the Fourth Circuit found that a jury could be persuaded that "the officers wantonly administered serious force to Mann in retaliation for his conduct rather than for the purpose of bringing him under control." *Id.*

The Fourth Circuit is also not alone in recognizing this right. For example, in *Cordell v. McKinney*, a prisoner claimed to have been put into an "escort position" with his hands restrained behind his back and slightly upraised when he was subsequently rammed headfirst into a wall while being transported in the prison. 759 F.3d 573, 577–78 (6th Cir. 2014). The Sixth Circuit reversed the district court's grant of summary judgment, finding that a reasonable jury could conclude that the deputy acted with "malicious and sadistic intent to cause harm" when using the plaintiff "as a human battering ram" and that such force certainly was more than de minimis.[7] *Id.* at 576, 581–82, 585–86.

The caselaw clearly established, at the time of the disputed events, the right to be free from pain inflicted maliciously and in order to cause harm through the use of excessive force against a subdued or restrained inmate in the course of transporting the inmate from one place to another for

---

[7] The Sixth Circuit held that one of the reasons why the deputy's use of force could satisfy the objective component of an Eighth Amendment claim was the "rather significant injuries from his contact with the wall," *Cordell*, 759 F.3d at 585–86, despite the Supreme Court's precedent in *Wilkins v. Gaddy*, 559 U.S. 34, 36–40 (2010), which turned the objective component away from an injury analysis, *id.*; *see infra* Part IV.B.1.a. However, the Sixth Circuit also based its analysis on other facts which showed the force was "an entirely unnecessary and disproportionate response to [the plaintiff] turning toward the deputy and violated contemporary norms," *Cordell*, 759 F.3d at 585–87, which would seem to comport with *Wilkins*.

a purpose other than protecting officer safety or maintaining prison order. The example in *Thompson* provides Fourth Circuit support for the more general proposition that intentionally and maliciously injuring a restrained inmate during transport is an unconstitutional use of excessive force. *Mann* further supports this theory in the more specific context of a cell extraction. Finally, the Fourth Circuit is not alone in recognizing this right, as evidenced in *Cordell,* thus demonstrating a wider consensus. Therefore, the right at stake in plaintiff's case was clearly established as of December 15, 2022.

### 4.    Keil is not entitled to summary judgment on count II.

Finally, Keil argues that he is entitled to summary judgment on count II because plaintiff has failed to identify sufficient evidence to support a supervisory liability claim under the Eighth Amendment. Keil's Mem. 12–14. Keil contends that there is no evidence in the record to demonstrate that he knew his subordinates would drop plaintiff, that Keil was deliberately indifferent, or that Keil's statements were "causally linked to the constitutional injury." *Id.* at 13–14. Plaintiff argues that Keil knew his statements would create a risk of a constitutional injury because of their punitive tone coupled with Keil's dangerous plan to extract plaintiff. Pl.'s Opp'n to Keil 11. Lucas, Goddard, and Hastings, according to plaintiff, understood Keil's actions to authorize or condone the use of force against plaintiff. *Id.* at 11–12. In reply, Keil contends that because plaintiff failed to address the supervisory liability factors, his response should be deemed a concession to Keil's position. Keil's Reply 9–11.

The Fourth Circuit has long held that supervisory officials "may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates." *Shaw v. Stroud*, 13

F.3d 791, 798 (4th Cir. 1994).[8]  Though liability can extend to the highest members of a chain of

command, liability is ultimately determined by "pinpointing the persons in the decisionmaking

chain whose deliberate indifference permitted the constitutional abuses to continue unchecked."

*Id.* (quoting *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984)).  The duty imposed on supervisors

requires them to "take steps to prevent" illegal activity "when on notice of a subordinate's tendency

to act outside the law."  *Randall v. Prince George's Cnty.*, 302 F.3d 188, 203 (4th Cir. 2002).

There are three main elements that plaintiff must meet in order to demonstrate supervisory

liability:

> (1) that the supervisor had actual or constructive knowledge that his subordinate
> was engaged in conduct that posed "a pervasive and unreasonable risk" of
> constitutional injury to citizens like the plaintiff; (2) that the supervisor's response
> to that knowledge was so inadequate as to show "deliberate indifference to or tacit
> authorization of the alleged offensive practices," and (3) that there was an
> "affirmative causal link" between the supervisor's inaction and the particular
> constitutional injury suffered by the plaintiff.

*Shaw*, 13 F.3d at 799; *see also Pratt-Miller v. Arthur*, 701 F. App'x 191, 193 (4th Cir. 2017).  The

knowledge element also has three sub-elements: "(1) the supervisor's knowledge of (2) conduct

engaged in by a subordinate (3) where the conduct poses a pervasive and unreasonable risk of

constitutional injury to the plaintiff."  *Shaw*, 13 F.3d at 799.  This third sub-element requires

evidence of widespread misconduct and that the conduct posed "an unreasonable risk of harm of

---

[8] The *Shaw* decision predates the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), which signaled a potential move away from the supervisory liability standard, *see Younger v. Crowder*, 79 F.4th 373, 384–85 n.16 (4th Cir. 2023).  Nevertheless, the Fourth Circuit has continued to apply the *Shaw* standard as recently as June 2024, in *Johnson v. Robinette*, 105 F.4th 99, 123 (4th Cir. 2024).  However, even if the *Iqbal* standard were applied in this case and supervisory liability would no longer be a permissible foundation for count II, the result in this case would not change because plaintiff has adequately pled a bystander liability theory.  *Iqbal*, 556 U.S. at 677 ("In a [section] 1983 suit or a *Bivens* action—where masters do not answer for the torts of their servants—the term 'supervisory liability' is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, *is only liable for his or her own misconduct*.") (emphasis added).

constitutional injury." *Id.* Generally, this sub-element cannot be proven by evidence of a single incident. *Timpson v. Anderson Cnty. Disabilities & Special Needs Bd.*, 31 F.4th 238, 257–58 (4th Cir. 2022); *Orpiano v. Johnson*, 632 F.2d 1096, 1101 (4th Cir. 1980).

The second element requires a showing of deliberate indifference, which imposes a high burden on the plaintiff. *Shaw*, 13 F.3d at 799. "[A] single incident or isolated incidents" are insufficient proof of this element. *Id.* Rather, "[a] plaintiff may establish deliberate indifference by demonstrating a supervisor's 'continued inaction in the face of documented widespread abuses.'" *Id.* (quoting *Slakan*, 737 F.2d at 373).

Finally, the third element—causation—is established when there is an "'affirmative causal link' between the supervisor's inaction and the harm suffered by the plaintiff." *Shaw*, 13 F.3d at 799. Sufficient proof must be provided to establish that the inaction is both a proximate cause and cause in fact. *Id.*

The Fourth Circuit has been clear that evidence of widespread misconduct is required to put a supervisor on notice and impose the supervisor's duty to look out for their subordinate's misconduct. *See e.g., Randall*, 302 F.3d at 206. In this case, plaintiff has failed to produce such evidence of widespread misconduct on the part of any of Keil's subordinates.[9] This failure is fatal to plaintiff's *supervisory liability* theory. However, supervisory liability is closely related to the theory of bystander liability, which both recognize that, in certain circumstances, liability may

_____

[9] Hastings admits to being disciplined by the Chesapeake Sherrif's Department for "[n]ot sending trays up fast enough, or between shifts, not checking with [his] supervisor." Keil's Mem. Ex. 3, ECF No. 43-3, 11:19–24 ("Hastings Dep."). Lucas remembers possibly having been written up but is not sure what conduct was involved in that incident. Lucas Dep. 10:8–20. Plaintiff testified that the deputies involved in the extraction had been rough with him before. Wetherington Dep. 9:5–9. However, when asked more about these events, plaintiff could only name Goddard as having assaulted him in the past and plaintiff did not file a report for this incident. *Id.* at 54:16–55:19. Therefore, these vague mentions of prior abuse and possible misconduct are insufficient to demonstrate the kind of widespread abuses that Keil should have been aware of.

23

attach to one who did not personally inflict the excessive force. *See Johnson v. Robinette*, 105 F.4th 99, 123–24 (4th Cir. 2024) (discussing both theories and analyzing whether a supervisor could be liable as a bystander). Here the facts are sufficient for a jury to find that Keil was both a supervisor and a bystander. Given that and in light of the nature of the factual allegations in count II, it is appropriate to consider whether he is legally accountable as a bystander.

"In general, whether a complaint sufficiently states a claim upon which relief can be granted is governed by the Supreme Court's plausibility pleading framework." *Stevenson v. City of Seat Pleasant*, 743 F.3d 411, 417 (4th Cir. 2014). There is no requirement to use "precise or magical words" in order to plead a cause of action for bystander liability. *Id*. at 418. In fact, the phrase "bystander liability" need not be included in the complaint. *Id*. Rather, as long as "it requires no legal gymnastics or finagling to liken the language" of the complaint to the elements of a bystander liability claim, a plaintiff has met his pleading burden. *Id*. at 419.

Generally, a law enforcement official is only liable for their affirmative misconduct. *Randall*, 302 F.3d at 202. However, an officer may be liable as a bystander if the officer: "(1) is confronted with a fellow officer's illegal act, (2) possesses the power to prevent it, and (3) chooses not to act." *Id*. at 203. In such cases, the bystanding officer may be treated as an accomplice. *Id*. Bystander liability, in the law enforcement context, "establishes that 'one who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence or otherwise within his knowledge.'" *Quinn v. Zerkle*, 111 F.4th 281, 295 (4th Cir. 2024) (quoting *Randall*, 302 F.3d at 204)). It is the "law officer's duty to uphold the law and protect the public from illegal acts, regardless of who commits them." *Randall*, 302 F.3d at 203.

Plaintiff's complaint alleges (1) that Keil was supervising Lucas, Goddard, and Hastings, (2) Keil was present for the allegedly unconstitutional activity "as the head correctional officer and supervisor on the scene," and (3) Keil's instructions led to the use of excessive force. Compl. ¶¶ 42–45. It takes no legal gymnastics to glean from these paragraphs that plaintiff alleges that Keil was present during both uses of force, that he would have therefore witnessed the alleged Eighth Amendment violation, and, as one of the supervisors on scene, he oversaw the excessive application of force rather than preventing it. As plaintiff has sufficiently pled the closely related theory of bystander liability, the Court addresses it below.

Keil was present for both uses of force as evidenced by his own admissions and the video. Keil's Mem. ¶ 5–19; *see* Video. Keil is first outside plaintiff's original cell instructing the deputies. Video at 0:00–0:55. He then is present in plaintiff's original cell as plaintiff is handcuffed, lifted, and removed from the cell. *Id.* at 1:03–1:27. As the deputies carry plaintiff down the hallway, Keil appears to follow them down the hallway[10] and claims to have been instructing the deputies to change their grip on plaintiff's arms and to go "easy" on plaintiff. *Id.* at 1:27–1:50. Keil then enters the new cell just seconds after plaintiff is propelled to the floor. *Id.* at 1:52–1:57. Therefore a reasonable jury could find that Keil observed the inappropriate manner in which plaintiff was carried and, as one of the supervisors on scene, possessed an ability to prevent the excessive use of force and failed to act. Additionally, a reasonable jury could conclude that he also incited and observed the deputies propelling plaintiff to the floor of the new cell, possessed the ability to prevent it, and again chose not to act. Therefore, taking the facts in the light most favorable to

---

[10] Though Keil is not captured on video walking behind the camera as the camera is focused on the deputies carrying plaintiff, Keil follows behind the camera as evidenced by how quickly he appears in the new cell after the camera arrives. Video at 1:27–1:57.

plaintiff, a reasonable jury could find Keil liable as a bystander for his presence and role in supervising the carrying and dropping of plaintiff.[11]

Courts have long been deferential to officers in use of force scenarios, because situations creating the need for use of force so often turn on split second decisions that are nearly impossible to fairly judge with hindsight. *Graham v. Connor,* 490 U.S. 386, 396–97 (1989). Despite this deference, taking the facts in the light most favorable to plaintiff, as the Court must at this juncture, Keil is not entitled to judgment as a matter of law as to count II. Accordingly, Keil's motion for summary judgment as to counts I and II is **DENIED.**[12]

---

[11] Though Keil argues he "enjoys qualified immunity as to plaintiff's Eighth Amendment claims in the complaint," Keil's Mem. 6, Keil only discusses liability under count II rather than a qualified immunity defense, *id.* at 12–14. Keil does not contest whether the right at issue in count II has been established. However, the Court notes that corrections officers' duties under both supervisory liability and bystander liability at the time of the pertinent events were well established. *See e.g., Johnson*, 105 F.4th at 123–24; *Randall*, 302 F.3d at 202–07.

[12] Keil also argues in his reply brief that plaintiff "has failed to meet his burden to create a dispute of material fact in the summary judgment record" due to noncompliance with Local Civil Rule 56(B), since he has both failed to cite adequate evidence from the record and "many of the [cited] facts . . . are immaterial." Keil's Reply 2. However, "a non-movant's failure to comply with Local Rule 56 does not automatically result in a ruling in favor of the moving party. Even if a non-moving party fails to comply with Local Rule 56(B), the Court should still generally determine whether the moving party has met its burden on a motion for summary judgment, rather than deciding the motion on a technicality." *Brown v. Serenity C&C*, 391 F. Supp. 3d 546, 551 (E.D. Va. 2019). The Court therefore declines to address plaintiff's alleged violation of Local Civil Rule 56(b).

**B.    Hastings' Motion for Summary Judgment**

In support of his motion, Hastings makes four arguments, each of which the Court addresses below.

### 1.    Hastings is not entitled to summary judgment because a reasonable jury could find he violated the Eighth Amendment.

#### a.    Genuine disputes of material fact exist as to whether Hastings' use of force could be classified as more than de minimis.

Hastings first argues that because his only role in the incident was to carry plaintiff's legs and lower them to the ground, this action does not constitute a de minimis use of force—the first element of an Eighth Amendment violation. Hastings' Mem. 4–5. Therefore, Hastings argues that qualified immunity applies because plaintiff cannot establish the first element "demonstrat[ing] the requisite constitutional violation." *Id.* at 6. Plaintiff argues that the extent of his injuries and the fact that the entire extraction and transport was "an inherently dangerous procedure" are sufficient evidence to prove that the use of force clears the de minimis hurdle. Pl.'s Opp'n to Hastings 4.

The Court finds that whether Hastings' participation in the extraction and transfer of plaintiff to his new cell was more than de minimis force involves disputed material facts. Since the Supreme Court's decision in *Wilkins v. Gaddy*, courts look to the nature of the force used— not to the resulting injury—to determine if there has been a sufficiently serious application of force. 559 U.S. 34, 36–40 (2010) (finding that the Fourth Circuit's interpretation of *Hudson v. McMillian* impermissibly turned the inquiry from the nature of the force to the extent of the injury).

> What happens *after* force is employed—whether and what kind of treatment is provided—may bear on the extent of an inmate's injuries, but it will not affect the nature of the force itself. And as we have explained, it is the force itself that is the focus of the objective component.

*Dean,* 984 F.3d at 303. To determine whether force is more than de minimis, courts look to whether the force was "sufficiently serious to establish a cause of action," which is a low bar. *Brooks*, 924 F.3d at 112.

Examples of more than de minimis force include: (1) several rounds of pepper spray dispensed over 9 to 14 seconds, *Iko*, 535 F.3d at 231–32, 239; (2) "deploying a taser—a weapon 'designed to cause excruciating pain' that can 'burn a subject's flesh,'" *Brooks*, 924 F.3d at 112; and (3) "the momentum from [a] van" sufficient to cause bleeding and bruising, *Thompson*, 878 F.3d at 101. Because the standard for de minimis force is so low, a reasonable jury could easily find that the force it takes to carry a prisoner by his arms and legs, suspended over the ground face-down, and then propel him to the ground with such force that results in a "[d]islocation of [the] temporomandibular joint," head contusion, and sprained shoulder, Pl.'s Opp'n to Hastings Ex. 4, ECF No. 53-4, at 1, are both more than de minimis uses of force. Though Hastings claims to have only carried plaintiff's legs and that this use of force is de minimis, Hastings' Mem. 4–5, Hastings' apparent concerted action with other deputies in administering both applications of force to plaintiff could cause a reasonable jury to conclude he administered more than de minimis force.

### b.   There are material facts in dispute regarding Hastings' intent.

As a reminder, there are four factors that help to determine if an officer intended to punish an inmate rather than use force to maintain prison order or protect officer safety: (1) "the need for the application of force," (2) "the relationship between the need and the amount of force that was used," (3) "the extent of the threat to the safety of staff and inmates," and (4) "any efforts made to temper the severity of a forceful response." *Whitley*, 475 U.S. at 321.

The Court has already extensively examined the *Whitley* factors in discussing Keil's motion for summary judgment, and much of that analysis is the same for Hastings' motion.

28

Hastings was present for Keil's potential incitement to harm plaintiff and was not only present but participated in the painful method of extracting and transporting plaintiff to his new cell. *See* Video. Hastings was present for every step of the transport when plaintiff was forcefully directed head and shoulders first to the ground of his new cell. *Id.* at 1:27–1:57. After plaintiff's apparent injury, the video shows Hastings, along with the other deputies, leaving the cell rather than rendering aid to an inmate with mental health problems and possible physical injuries. *Id.* at 2:35–2:44. Taking the facts and inferences to be drawn therefrom in the light most favorable to plaintiff, a reasonable jury could find that Hastings possessed the subjective intent to punish and harm plaintiff and jointly assisted in doing so.

### 2.    Hastings is not entitled to qualified immunity.

Hastings asserts that because plaintiff cannot establish that he violated the Eighth Amendment, he is also entitled to qualified immunity. Hastings' Mem. 6; Hastings' Reply 5. Given the above analysis into Hastings' potential violation of the Eighth Amendment, a reasonable jury could find that plaintiff has met his burden on the first element of a qualified immunity defense. Moreover, although Hastings does not argue the second element of a qualified immunity defense, whether the right at issue in this case has been clearly established, the Court's analysis would be the same for Hastings as it is for Keil. Therefore Hastings is not entitled to qualified immunity.

### 3.    Hastings' motion for summary judgment must also be denied in light of plaintiff's bystander liability theory.

The Court now turns to plaintiff's bystander liability argument, which was raised in plaintiff's memorandum in opposition to Hastings' motion for summary judgment. Pl.'s Opp'n to Hastings 6. Notably, Hastings did not reply to this argument. *See* Hastings' Reply. As a reminder, bystander liability requires proof of three elements requiring that the officer: "(1) is confronted

29

with a fellow officer's illegal act, (2) possesses the power to prevent it, and (3) chooses not to act." *Randall*, 302 F.3d at 203.

A reasonable jury could find, similar to Keil, that Hastings is liable as a bystander for his fellow deputies' violation of the Eighth Amendment. As has been discussed at length, a reasonable jury could find that Keil, Lucas, and Goddard violated the Eighth Amendment through both uses of force, potentially in collusion with Hastings. *See supra* Part IV.A.3.a. Hastings was undeniably present and participating in both uses of force. *See* Video; Hastings' Mem. ¶¶ 5–6. Taking these facts in the light most favorable to plaintiff, a reasonable jury could find that in the 103 seconds between when Hastings first appears in the video and when plaintiff is dropped, Video at 0:08–1:51, Hastings possessed the ability to take action to prevent the unconstitutional injuries and that he chose not to do so. Therefore, Hastings is also not entitled to summary judgment because a reasonable jury could find him liable as a bystander.

### 4.    Hastings is not entitled to summary judgment based on his classification of plaintiff's causation argument.

In response to plaintiff's assertion that Hastings was a cause of plaintiff's injuries, Hastings in his reply characterizes plaintiff's theory of causation as "effective causation," and argues that this theory is no longer permitted by the Fourth Circuit in excessive force cases. Hastings' Reply 3–4. Hastings argues that effective causation cannot be applied in any excessive force case and cites *Amisi v. Brooks* and *Gandy v. Robey* to support this argument. *Id.*

Effective causation allows a plaintiff to prove causation by proving that a defendant set "in motion a series of acts by others which the [defendant] knows or reasonably should know would cause others to inflict the constitutional injury." *Gandy v. Robey*, 520 F. App'x 134, 141 (4th Cir. 2013) (quoting *Sales v. Grant*, 158 F.3d 768, 776 (4th Cir. 1998)). However, Hastings argues that in excessive force cases, the Court only "look[s] to the 'moment' the force is employed," which

makes any prior actions irrelevant, and precludes resorting to effective causation. *Amisi v. Brooks*, 93 F.4th 659, 670 (4th Cir. 2024). Therefore, Hastings contends that plaintiff cannot rely on any evidence pertaining to actions before the force—which he defines as the moment plaintiff was propelled to the floor—including "Hastings' training, prior carries, or his participation in the transport." Hastings' Reply 4.

The Court is unpersuaded by Hastings' reading of *Amisi* and *Gandy*. In *Gandy*, the plaintiff argued that the court should apply an effective causation analysis in a Fourth Amendment excessive force case. 520 F. App'x at 141. Rejecting this argument, the Fourth Circuit deemed the effective causation theory as "highly dubious in the excessive force context." *Id.* at 142. In *Amisi*, the Fourth Circuit was asked to consider extending the limit on the use of effective causation beyond the Fourth Amendment excessive force context to the entire Fourth Amendment. 93 F.4th at 670. The court declined to do so, finding that limiting the theory of causation in such a manner would "*read the causation language out of [section] 1983*." *Id.* (emphasis added).

Singling out particular quotations from *Amisi* and *Gandy,* Hastings contends that the Fourth Circuit has found that effective causation can never be used in an excessive force context. Hastings' Reply 4. What Hastings omits is the fact that both decisions turned on an application of the *Fourth Amendment* excessive force standard, *Gandy*, 520 F. App'x at 142; *Amisi*, 93 F.4th at 670, which is governed solely by the test of objective reasonableness. *Graham,* 490 U.S. at 396. The Eighth Amendment standard for excessive force, however, is very different and turns on an objective use of more than de minimis force and a *subjective* intent to inflict wanton force on a prisoner. *Brooks*, 924 F.3d at 112. To prove that subjective element, the Supreme Court laid out factors that require courts to look to what happened *before* the force was applied, like the threat the prisoner poses and the need for the use of force. *Whitley*, 475 U.S. at 321. The Court, therefore,

31

declines to accept Hastings' argument. Nor has Hastings supplied the Court with any caselaw where the Fourth Circuit has applied the limitations of *Amisi* and *Gandy* to the Eighth Amendment in the decade since the decision in *Gandy*.

The Court also rejects Hastings' argument that plaintiff has failed to allege facts supporting direct causation and that plaintiff's only evidence goes to effective causation. Hastings' Reply 2–5. In so arguing, Hastings primarily cites to portions of plaintiff's memorandum in opposition addressing matters other than causation. *See generally id.* Plaintiff argues that Hastings' participation in the carry was a substantial factor because his assistance was essential and plaintiff's injury was a foreseeable consequence of the deputies' actions. Pl.'s Opp'n to Hastings 7–8. This argument references Hastings' involvement in the carrying and dropping of plaintiff, *id.*, which appears to obviate any need for effective causation and highlights that plaintiff's excessive force claim relates to both uses of force. Because a reasonable jury could find that Hastings violated the Eighth Amendment and plaintiff was injured during the violation, a reasonable jury could similarly find that Hastings caused plaintiff's injuries.

Accordingly, Hastings' motion for summary judgment is **DENIED**.

## V.    CONCLUSION

For the foregoing reasons, Keil's motion for summary judgment, ECF No. 42, and Hastings' motion for summary judgment, ECF No. 45, are **DENIED**.

The Clerk is **DIRECTED** to send a copy of this memorandum opinion and order to all counsel of record.

**IT IS SO ORDERED.**

_____
Robert J. Krask
United States Magistrate Judge

Norfolk, Virginia
October 30, 2025